**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
| :
ELISABETH DALTON,            :     CIVIL ACTION
               Plaintiff,    :
    v.                     :     NO. 17-2822
                          :
NANCY A. BERRYHILL,[1] ACTING    :
COMMISSIONER OF SOCIAL        :
SECURITY,                    :
               Defendant,   :
_____ :

Henry S. Perkin, M.J.                                        September 28, 2018

## MEMORANDUM

        Plaintiff, Elisabeth Dalton ("Plaintiff"), brings this action under 42 U.S.C. §

1383(c)(3), which incorporates 42 U.S.C. § 405(g) by reference, to review the final decision of

the Commissioner of Social Security ("Defendant"), denying her claim for supplemental security

income ("SSI") provided under Title XVI of the Social Security Act ("the Act").  42 U.S.C. §§

1381-1383f.  Subject matter jurisdiction is based upon section 205(g) of the Act.  42 U.S.C. §

405(g).  Presently before this Court is Plaintiff's Brief and Statement of Issues in Support of

Request for Judicial Review, Defendant's Response to Request for Review of Plaintiff, and

Plaintiff's Reply Brief.  For the reasons that follow, the relief sought by Plaintiff will be granted

and the case remanded for further administrative proceedings.

## I.     PROCEDURAL HISTORY

        Plaintiff protectively filed an application for Supplemental Security Income

benefits ("SSI") on July 30, 2013, alleging disability beginning April 1, 2009 due to brittle

---

[1]       On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of the Social Security Administration and, therefore, she should be automatically substituted as the Defendant in this action. See Fed. R. Civ. P. 25(d).

diabetes type 1, diabetic neuropathy, diabetic dermopathy, gastroparesis, bowel incontinence and high cholesterol. (Record at 215.)[2] Plaintiff's application was denied initially by the state agency on October 21, 2013. (Id. at 103.) Thereafter, Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ") and a hearing was held before ALJ Alan Sacks on April 15, 2015, at which Plaintiff appeared and testified. (Id. at 30.) During the hearing, Plaintiff amended her alleged onset date of disability to July 30, 2013, the date of her application for SSI benefits. (Id. at 21, 33.) Michael Kibler, an impartial vocational expert ("VE") also appeared and testified at the hearing. (Id. at 67-72.)

Having considered evidence of Plaintiff's impairments, ALJ Sacks issued an unfavorable decision on May 27, 2015, in which he found that Plaintiff has not engaged in any substantial gainful activity since July 30, 2013, her application date and she has not had any severe impairment meeting the duration requirements of the Act since July 30, 2013, thus she has not been disabled from July 30, 2013 through May 27, 2015. (Id. at 21-25.) ALJ Sacks concluded that Plaintiff was not disabled for the purpose of receiving supplemental security income benefits from July 30, 2013 through May 27, 2015. (Id. at 25.) Plaintiff timely requested review of the ALJ's decision, which was denied by the Appeals Council on April 21, 2017. (Record at 1-3.) As a result, ALJ Sacks' May 27, 2015 decision became the final decision of the agency.

_____

[2]     Plaintiff previously filed a SSI application on November 24, 2009, alleging disability due to diabetes and diabetic neuropathy, nerve damage to her legs/feet and pain and swelling beginning on April 1, 2009. That claim was denied both initially and by Administrative Law Judge Owen Katzman following a hearing and decision dated May 10, 2011 in which ALJ Katzman found Plaintiff's diabetes and diabetic neuropathy severe conditions but that Plaintiff was able to perform her past relevant customer service work as allowed by her residual functional capacity to perform sedentary work with an allowance to sit and stand at will. (Record at 79-85.) The Appeals Council denied review of ALJ Katzman's decision. (Id. at 187.)

Plaintiff initiated this civil action on June 22, 2017, seeking judicial review of the Commissioner's decision that she is not entitled to SSI benefits. Dkt. No. 1. The matter was subsequently referred for preparation of a Report and Recommendation on December 12, 2017 by the Honorable Joseph F. Leeson. Dkt. No. 15. On December 28, 2017, the parties filed a Consent to Jurisdiction by a U.S. Magistrate Judge. Dkt. No. 9. On January 3, 2018, Judge Leeson approved the consent and Ordered the referral of this case for final disposition in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. Dkt. No. 16.

## II.    FACTS AND MEDICAL EVIDENCE

Plaintiff, born in November 1965, was forty-seven years old[3] on July 30, 2013, her alleged disability onset date and the date of her disability application. Plaintiff testified at the ALJ hearing that she completed high school in 1983. (Id. at 216.) She previously worked as a bank teller and an order clerk, and she was last employed in 2009 as a bank teller. (Id. at 43-44, 68.) At the time of the ALJ hearing in April of 2015, Plaintiff had no source of income, she had lived with one of her sisters for three years and her other sister regularly paid her rent and gave her some money for living expenses. (Id. at 46-48.)

Plaintiff testified that she usually cooks or makes herself something to eat most days, washes dishes, occasionally dusts furniture, sweeps, cleans up spills, takes care of her personal hygiene and is able to drive a car. (Record at 47-48.) She opines that due to a lack of muscle strength, she is unable to pick up a gallon of liquids with one hand and the heaviest thing

---

[3]    At the time of the filing of her application, Plaintiff qualified as a "younger person" under the regulations. Because of such, her age is not considered a significant impediment to adapting to new work situations. 20 C.F.R. § 416.963(b)(2000). The Court must "cautiously scrutinize the employment prospects of so young an individual before placing [her] on the disability rolls." Lockley v. Barnhart, No. 05-5197, 2006 U.S. Dist. LEXIS 29722, at *2 n.1 (E.D. Pa. May 16, 2006)(Baylson, J.)(quoting McLamore v. Weinberger, 530 F.2d 572, 574 (4th Cir. 1976)).

she is able to pick up is a grocery bag.  (Id. at 48, 54-55.)  The longest she can either stand in one spot before needing to sit or walk before needing to stop is 10 to 15 minutes.  (Id. at 49.)

Plaintiff wears a continuous feed pod insulin pump on her right arm which delivers insulin by remote control.  She must input the amount of carbohydrates she intends to eat at each meal into the remote, and the pump calculates and delivers the necessary insulin through her arm twenty-four hours a day.  (Record at 49-50.)  At the ALJ hearing, Plaintiff denied smoking, drinking alcohol or taking any drugs other than those prescribed for her from doctors.  (Id. at 62.)  Plaintiff testified that she experiences constant pain in her legs and feet.  (Id. at 51.)  She takes Lyrica[4] for the pain which helps her "a lot" but she always has a low level of pain.  (Id.)  The pain limits her ability to do "basic stuff around the house, activities outside of the house.  I mentioned like the amusement park.  Anything like going bowling or miniature golf.  Any of the activities that I used to enjoy.  I can't ride a bike."  (Id. at 63.)   Plaintiff testified that the pain, numbness and tingling from her diabetic neuropathy is holding her back in her activities.  (Id. at 52.)  Prolonged sitting, standing and walking make the numbness in her feet and legs worse.  (Id. at 55-56.)  Sitting is easier for her than standing as long as she has her legs stretched out or elevated and when she is at home watching television or reading, her legs are always elevated.  (Id. at 56-57.)  She started elevating her legs approximately ten years before due to her neuropathy diagnosis.  (Id. at 57.)  Plaintiff also lacks a "tiny bit" of feeling in her

_____

[4]        Lyrica (pregabalin) is an anti-epileptic drug, also called an anticonvulsant. It works by slowing down impulses in the brain that cause seizures. Pregabalin also affects chemicals in the brain that send pain signals across the nervous system.  Lyrica is used to treat pain caused by fibromyalgia, or nerve pain in people with diabetes (diabetic neuropathy), herpes zoster (post-herpetic neuralgia), or spinal cord injury.
        Common side effects of Lyrica include: infection, ataxia, blurred vision, constipation, diplopia, dizziness, drowsiness, fatigue, headache, peripheral edema, tremor, weight gain, visual field loss, accidental injury, and xerostomia.  See Https://www.drugs.com/lyrica.html last visited Sept. 24, 2018.

hands.  (Id. at 54.)  She stated that:

> I don't have feeling in my feet.  I don't feel heat or cold or pain in my legs.  If I
> get a wound or a burn or anything, I don't feel it.  I don't know it's happening.
> That's the one thing is the neuropathy.  The other is the enteropathy which I don't
> – I guess you don't have records on that is bowel incontinence.

(Id. at 53.)  Plaintiff's daily issues with bowel incontinence are unpredictable, with no specific

trigger and some days are better than others, but she reports more bad than good days in a week.

(Id. at 53, 64-66.)  She was told to take Imodium by her doctor, but testified that her trial with

Imodium was unsuccessful and states that there is no other prescription medication that can help

with the diarrhea.  (Id. at 54.)  Her blood sugar runs high daily, and her gastroparesis[5] causes

delayed stomach emptying which raises her blood sugars, making her feel extremely tired, very

thirsty and lethargic.  (Id. at 64-65.)  She can feel high blood sugar starting and testified that she

checks her sugars eight to ten times per day.  (Id. at 65.)

        Plaintiff can and does go shopping and she relies on pushing a cart when she goes

---

[5]     Gastroparesis is a disorder affecting people with both type 1 and type 2 diabetes in which the stomach takes too long to empty its contents (delayed gastric emptying). The vagus nerve controls the movement of food through the digestive tract. If the vagus nerve is damaged or stops working, the muscles of the stomach and intestines do not work normally, and the movement of food is slowed or stopped.

Gastroparesis can make diabetes worse by making it more difficult to manage blood glucose. When food that has been delayed in the stomach finally enters the small intestine and is absorbed, blood glucose levels rise. If food stays too long in the stomach, it can cause problems like bacterial overgrowth because the food has fermented. Also, the food can harden into solid masses called bezoars that may cause nausea, vomiting, and obstruction in the stomach. Bezoars can be dangerous if they block the passage of food into the small intestine.

The most important treatment goal for diabetes-related gastroparesis is to manage your blood glucose levels as well as possible. Treatments include insulin, oral medications, changes in what and when you eat, and, in severe cases, feeding tubes and intravenous feeding.

If you have gastroparesis, your food is being absorbed more slowly and at unpredictable times. To better manage blood glucose, many people work with their doctor and/or diabetes educator and dietitian to come up with a plan that may involve: Taking insulin more often; Taking your insulin after you eat instead of before you eat; Checking your blood glucose more often after you eat to better match insulin to the delayed rise in blood glucose. Several drugs are used to treat gastroparesis. Your doctor may try different drugs or combinations of drugs to find the most effective treatment.

See http://www.diabetes.org/living-with-diabetes/complications/gastroparesis.html, lat visited Sept. 24, 2018.

grocery shopping because she needs something to lean on for support while waiting to check out. (Id. at 63-64.)  If the cart gets too heavy, she relies on her daughter or her sister to push the cart. (Id. at 64.)  She also relies on her daughter to help with laundry if it gets too heavy for her to carry.  (Id. at 64.)

Plaintiff does not cook meals because they require too much time on her feet, and she usually makes frozen dinners.  (Id. at 66.)  She was not prescribed a cane to use, but had one at the ALJ hearing and stated that she has been voluntarily using a cane since late 2013 if she is without her medications, knows that she will be walking on uneven rocky ground or knows she will be going somewhere where she may be standing or walking for an extended period of time. (Id. at 66-67.)

On February 14, 2012, Plaintiff was admitted to the Reading Hospital and Medical Center for diabetic ketoacidosis[6] with blood glucose levels between 400 and 500. (Record at 596-597, 679-687.)  She reported fainting episodes since June, 2011 with typical glucose finger stick readings in the 400s and frequent urination.  (Id. at 602.)  She denied vomiting but reported nausea throughout the day.  (Id. at 606.)  She had decreased sensation from approximately her mid calf of the knee down bilaterally in both extremities.  (Id. at 607.)  She had no reported diarrhea, no nausea, vomiting or significant edema in her extremities.  (Id. at

---

[6]     Diabetic ketoacidosis is a buildup of acids in the blood.  It can happen when blood sugar is too high for too long and can be life-threatening, but it usually takes many hours to become that serious.  It usually happens due to a lack of insulin.  Cells cannot use the sugar in blood for energy, so they use fat for fuel instead. Burning fat makes acids called ketones and, if the process goes on for a while, they can build up in the blood.  That excess can change the chemical balance of blood and throw off the entire system.
        People with type 1 diabetes are at risk for ketoacidosis, since their bodies do not make any insulin. Ketones can go up when a meal is missed, a person is sick, stressed, or has an insulin reaction.  Treatment and prevention includes receiving insulin intravenously to bring down ketones and fluids for hydration and to balance blood chemistry.  A doctor may change the insulin dose or type and the patient should drink more water and sugar-free, non-alcoholic beverages.  Good blood sugar control will help avoid ketoacidosis.  See https://www.webmd/com/diabetes/ketoacidosis, last visited Sept. 27, 2018.

609.)  Plaintiff was discharged the next day after the ketoacidosis resolved, she was counseled to stop smoking especially with her Type 1 diabetes, and follow up was arranged with the Diabetes Center.  (Id. at 610.)

Over one year before her alleged disability onset date, Plaintiff underwent a gastric emptying study on March 23, 2012.  (Record at 587-88.)  A normal study indicates that the stomach retains 0-10% of its contents at four hours.  Plaintiff's stomach retained 34% of its contents at four hours, indicating that she has delayed gastric emptying.  (Id.)

On April 17, 2012, Plaintiff was admitted to the Reading Hospital and Medical Center for diabetic ketoacidosis, abdominal pain and vomiting.  (Id. at 540-557, 665-675.) Plaintiff reported a recent tooth extraction, not eating due to pain in her mouth and stopping her insulin for two days which caused increasing weakness and abdominal pain.  (Id. at 555.)  She had no complaints of pain, numbness or tingling in her lower extremities and had no edema.  (Id. at 552, 556.)

Seven months before Plaintiff's alleged onset of disability, on December 5, 2012, Plaintiff was seen at the Reading Hospital Wound Healing & Hyperbaric Medicine Center for two right leg ulcers, one on her leg and one on her ankle.[7]  (Record at 312-315, 638-641, 758-761.)  She underwent weekly examination and treatment of the wounds on December 12, 19, and 28, 2012 and January 2, 9, 15, and 30, 2013.  (Id. at 316-337, 752-755.)  The leg ulcer healed as of January 9, 2013, and the ankle ulcer was 100% resolved/re-epithelialized on January 30, 2013.

---

[7]     Plaintiff saw her primary care physician, Rebecca Huyett, D.O., on October 24, 2012, for a wound with discharge on her right shin which had reportedly not healed after four weeks.  Dr. Huyett prescribed an antibiotic for ten days and if there was no change, then a referral to wound care.  (Record at 642.)  Plaintiff complained of the wound and pain which was recorded as neuropathy.  (Id.)  Dr. Huyett saw Plaintiff for a wound check on November 16, 2012 and the wound was "getting a little better but not resolved."  (Id. at 691-693.)  She referred Plaintiff for follow up with wound care.  (Id. at 692.)

(Id. at 329, 335, 748-751.)

The day after her initial appointment with the Wound Center, Plaintiff underwent a lower extremity arterial pulse volume recording[8] at rest on December 6, 2012. (Id. at 530-31, 756-757.) This test revealed no significant arterial insufficiency to the level of bilateral metatarsals.[9] The bilateral digits (toes) were severely dampened and nearly flatlined. This was consistent with either vasospasm[10] or fixed occlusive disease [11]within the vessels extrinsic to the foot. (Id.)

On February 4, 2013, Plaintiff underwent an endoscopy due to GERD and reflux symptoms. (Id. at 746-747.) This test showed a normal stomach and duodenum and a 1.5 cm tip

---

[8]     A PVR study is a noninvasive vascular test in which blood pressure cuffs and a hand-held ultrasound device (called a Doppler or transducer) are used to obtain information about arterial blood flow in the arms and legs. This test is used to evaluate the presence of peripheral arterial disease. See https://my.clevelandclinic.org/health/diagnostics/17403-pulse-volume-recordings, last visited Sept. 27, 2018.

[9]     Metatarsal relates to the metatarsus, the part of the foot that includes the bones between the ankle and toes. See https://www.dictionary.com/browse/metatarsal, last visited Sept. 27, 2018.

[10]     A vasospasm is the narrowing of the arteries caused by a persistent contraction of the blood vessels, which is known as vasoconstriction. This narrowing can reduce blood flow. See https://www.cedars-sinai.edu/Patients/Health-Conditions/Vasospasm.aspx, last visited Sept. 27, 2018.

[11]     Occlusive peripheral arterial disease is a blockage or narrowing of an artery in the legs (or rarely the arms), usually due to atherosclerosis and resulting in decreased blood flow. Symptoms depend on which artery is blocked and how severe the blockage is. To make a diagnosis, doctors measure blood flow to affected areas. Drugs, angioplasty, or surgery is used to relieve the blockage and reduce symptoms.
Occlusive peripheral arterial disease is common among older people because it often results from atherosclerosis (plaque or disease buildup in the wall of the blood vessel), which becomes more common with aging. Occlusive peripheral arterial disease is also common among men; people who have ever smoked regularly; people with diabetes, high blood pressure, abnormal cholesterol levels, or high blood homocysteine (a component of protein) levels; people who have a family history of atherosclerosis; people who are obese; and people who are physically inactive. Each of these factors contributes not only to the development of occlusive peripheral arterial disease but also to the worsening of the disease. See https://www.merckmanuals.com/home/heart-and-blood-vessel-disorders/peripheral-arterial-disease/occlusive-peripheral-arterial-disease, last visited Sept. 27, 2018.

of erythemedious mucosa[12] extending proximally from the EG junction,[13] and biopsies were performed for histology.  (Id. at 747.)  On April 25, 2013, Plaintiff underwent a colonoscopy due to complaints of diarrhea which revealed small grade 1 internal hemorroids but no abnormality in the colon.   Biopsies were taken at the ascending, descending and sigmoid colon to rule out microscopic colitis.  (Record at 743-44.)   On May 23, 2013, Plaintiff saw gastroenterologist Paul F. Levy, M.D., for sporadic diarrhea.  (Record at 799.)  He noted that she had a negative colonoscopy, negative celiac serology, negative parasite and negative fecal fat test.  Biopsy of the duodenum was negative for celiac disease two years prior.  (Id.)  She reported no weight loss or other constitutional complaints and her physical exam was negative but she complained of having sporadic loose stools.  (Id.)  Dr. Levy recommended some serological studies, a small bowel series and repeat parasite study.  (Id.)

Five days before Plaintiff's alleged onset date of disability, Plaintiff saw Dr. Huyett for a wound on the back of her right calf for over one week and pus emanating from the wound for three days and small open sores at the corners of her lips/mouth.  (Record at 717-721.)

---

[12]    Erythematous mucosa of the stomach is a red, irritated lining within the stomach. This condition is generally seen when a patient has a diagnosis of gastritis, and the inflamed stomach lining is seen during an endoscopic evaluation. Biopsies may or may not be taken during endoscopy to evaluate and diagnosis the cause of the erythema.  See https://www.reference.com/science/erythematous-mucosa-stomach-575e83f4d, last visited Sept. 27, 2018.

[13]    Esophagaogastric junction is the terminal end of the esophagus and the beginning of the stomach at the cardiac orifice.  See https://medical-dictionary.thefreedictionary.com/esophagogastric+junction, last visited Sept. 27, 2018.

She was  diagnosed with perioral dermatitis[14] and prescribed Bactrim[15] to be taken twice daily and  Nizoral[16] cream to be topically applied once daily.  (Id. at 721.)

Two days before Plaintiff's alleged onset date of disability, on July 28, 2013, Plaintiff went to the emergency room for vomiting and abdominal pain.  (Record at 343-420.) She reported being a Type 1 diabetic, had daily diarrhea and was divorced.  (Id. at 349, 377.) She also reportedly smoked one-half pack of cigarettes per day for fifteen years. (Id. at 347, 377.) Russell Emrich, M.D., examined Plaintiff, and noted her prior treatment for "an abscess" on the back of her right lower leg, and also noted that Plaintiff could not report whether she experienced pain in the abscessed area due to numbness from her diabetic neuropathy. (Id. at 350-51.)  On examination, Dr. Emrich noted multiple skin lesions consistent with necrobiosis lipoidica[17] and that Plaintiff reported no sensation bilaterally in her feet, toes, and fingers.  (Id. at 353-354.)  On admission, Plaintiff was diagnosed with diabetic ketoacidosis with a glucose level over 700,

---

[14]     Perioral dermatitis is a rash that develops around the mouth - the word "perioral" meaning "around the mouth", and "dermatitis" meaning "inflammation of the skin".  See https://patientinfo./health/skin-rashes/perioral-dermatitis, last visited Sept. 27, 2018.

[15]     Bactrim contains a combination of sulfamethoxazole and trimethoprim. Sulfamethoxazole and trimethoprim are are both antibiotics that treat different types of infection caused by bacteria.  Bactrim is used to treat ear infections, urinary tract infections, bronchitis, traveler's diarrhea, shigellosis, and Pneumocystis jiroveci pneumonia.  See https://www.drugs.com/bactrim.html, last visited Sept. 27, 2018.

[16]     Nizoral (ketoconazole) is an antifungal medication that fights infections caused by fungus and should be used only when other antifungal medications cannot be used.  See https://www.drugs.com/nizoral.html, last visited Sept. 27, 2018.

[17]     Necrobiosis lipoidica is a rare skin disorder of collagen degeneration. It is characterized by a rash that occurs on the lower legs. It is more common in women, and there are usually several spots. They are slightly raised shiny red-brown patches. The centers are often yellowish and may develop open sores that are slow to heal. Infections can occur but are uncommon. Some patients have itching, pain, or abnormal sensations. It usually occurs more often in people with diabetes, in people with a family history of diabetes or a tendency to get diabetes, but can occur in nondiabetic people. About 11% to 65% of patients with necrobiosis lipoidica also have diabetes, but the exact cause is still not known. Treatment is difficult. The disease is typically chronic with variable progression and scarring.  See https://rarediseases.info.nih.gov/diseases/13040/necrobiosis-lipoidica, last visited Sept. 24, 2018.

acute renal failure, diabetic neuropathy, and diabetic gastroparesis and discharged on August 2, 2013. (Id. at 344, 355.)

The day after her discharge from the hospital, Plaintiff saw gastroenterologist Ravi Ghanta, M.D. (Id. at 375.) Dr. Ghanta concluded that Plaintiff's epigastric[18] pain was due to her gastroparesis and/or reflux esophagitis or gastritis.[19] (Id. at 381.) Dr. Ghanta concluded that Plaintiff's reportedly chronic intermittent diarrhea was possibly due to autonomic diabetic dysfunction. (Id.)

Four days later, on August 7, 2013, Plaintiff again was treated in the Reading Hospital and Medical Center emergency room for abdominal pain and nausea. She vomited coffee ground emesis with blood in the emergency room. (Id. at 421-425.) Plaintiff underwent an upper endoscopy. (Id. at 822-23.) Plaintiff's stomach was normal except for residual food consistent with gastroparesis and mild gastritis which was not re-biopsied. (Id. at 822.) Grade IV esophagitis was noted. (Id.) Plaintiff was treated for an upper gastrointestinal bleed and diabetic ketoacidosis and discharged on August 13, 2013, diagnosed with grade 4 erosive esophagitis with directions to follow up with a gastroenterologist in four weeks to evaluate her

---

[18]     Epigastric is defined as lying upon or over the stomach. See https://www.merriam-webster.com/dictionary/epigastric, last visited Sept. 24, 2018.

[19]     Gastritis is an inflammation of the stomach lining. The inflammation can be caused by many factors, including infection, stress resulting from severe illness, injury, certain drugs, and disorders of the immune system. Symptoms of gastritis include abdominal pain or discomfort and sometimes nausea or vomiting. Doctors often base the diagnosis on the person's symptoms, but sometimes they need to examine the stomach with a flexible viewing tube (upper endoscopy). Treatment is with drugs that reduce stomach acid.
See https://www.merckmanuals.com/home/digestive-disorders/gastritis-and-peptic-ulcer-disease/gastritis, last visited Sept. 24, 2018.

for Barrett's esophagus[20].  (Id. at 421, 821-832.)  The biopsy was negative for invasive cancer.

(Id. at 821.)  Plaintiff also had an appointment the next day with an endocrinologist regarding her

diabetic ketoacidosis.  She was continued on Reglan,[21] 5 mg three times per day for her

gastroparesis and 20 mg Oxycontin two times per day for pain control.  It was noted that she was

seen three times in eight days for abdominal pain.  (Id.)  She had normal range of motion, no

edema and no tenderness in her lower extremities.  (Id. at 433.)

      At an office visit with Dr. Huyett on Wednesday, August 21, 2013, following

Plaintiff's August 13, 2013 hospital discharge, the focus was on Plaintiff's hyperlipidemia.  (Id.

at 722-729.)  Although Plaintiff reported vomiting the day before her visit and that she took her

last Oxycontin the night of August 19, 2013, a review of Plaintiff's systems was negative for

nausea, vomiting, abdominal pain and diarrhea.  (Id. at 727.)  On physical examination, Plaintiff

appeared well developed and well nourished, had normal bowel sounds, no abdominal tenderness

and no musculoskeletal edema.  (Id.)  She was prescribed Zocor,[22] an Iron supplement and a

---

[20]     In Barrett's esophagus, tissue in the esophagus is replaced by tissue similar to the intestinal lining.
It is often diagnosed in people who have long-term gastroesophageal disease (GERD) - a chronic regurgitation of
acid from the stomach into the lower esophagus.  Only a small percentage of people with GERD will develop
Barrett's esophagus.  It is associated with an increased risk of developing esophageal cancer.  See
https://www.mayoclinic.org/diseases-conditions/barretts-esophaguis/symptoms-causes/syc-20352841, last visited
Sept. 27, 2018.

[21]     Reglan (metoclopramide) increases muscle contractions in the upper digestive tract.  This speeds
up the rate at which the stomach empties into the intestines.  Reglan is used for 4 to 12 weeks to treat heartburn
caused by gastroesophageal reflux in people who have used other medications without relief.  Reglan is also to treat
gastroparesis in people with diabetes, which can cause heartburn and stomach discomfort after meals.  See
https:/drugs.com/reglan.html, last visited Sept. 27, 2018.

[22]     Zocor (simvastatin) belongs to a group of drugs called HMG CoA reductase inhibitors, or
"statins." Simvastatin reduces levels of "bad" cholesterol (low-density lipoprotein, or LDL) and triglycerides in the
blood, while increasing levels of "good" cholesterol (high-density lipoprotein, or HDL).  Zocor is used to lower
cholesterol and triglycerides (types of fat) in the blood.  It is also used to lower the risk of stroke, heart attack, and
other heart complications in people with diabetes, coronary heart disease, or other risk factors.  See
https://drugs.com/zocor.html, last visited Sept. 27, 2018.

Vitamin D3 supplement.  (Id. at 728.)  Plaintiff was to return for her next appointment in three months.  (Id. at 729.)

Less than one week later on Tuesday, August 27, 2013, Plaintiff presented to Dr. Huyett's office with painful edema in her feet and ankles.  (Id. at 735.) Plaintiff stated that she had edema for a few days which had improved and then started again on the intervening Saturday and attributed it to the excessive intravenous fluids she received in the hospital from August 7 to August 13, 2013.  (Id. at 735.)  A review of Plaintiff's systems was positive for leg swelling but negative for chest tightness and shortness of breath, chest pain and palpitations, negative for urgency, frequency and difficulty urinating, negative for nausea, vomiting, abdominal pain, diarrhea and constipation, and negative for dizziness and headaches.  (Record at 735.)   Plaintiff exhibited edema in her feet, but she had a normal cardiac rate and rhythm, her breathing effort and sounds were normal, she had no wheezes or rales and her abdomen was soft, bowel sounds were normal and there was no abdominal tenderness.  (Id.)  Dr. Huyett prescribed hydrodiuril[23]25 mg, once daily and told Plaintiff to watch her fluids and salt and wear compression stockings for her edema.  (Id.)

On October 7, 2013, Dr. Levy performed an endoscopy on Plaintiff for complaints of heartburn, dyspepsia-acid and diarrhea.  (Id. at 817-18, 905-906.)  The test showed no gross abnormality in the esophagus, findings consistent with gastritis in the stomach and a normal

---

[23]        Hydrodiuril is used to treat high blood pressure. Lowering high blood pressure helps prevent strokes, heart attacks, and kidney problems. Hydrochlorothiazide belongs to a class of drugs known as diuretics/"water pills." It works by causing you to make more urine. This helps your body get rid of extra salt and water. This medication also reduces extra fluid in the body (edema) caused by conditions such as heart failure, liver disease, or kidney disease. This can lessen symptoms such as shortness of breath or swelling in your ankles or feet. See https://www.webmd.com/drugs.2/drug-7144/hydrodiuril-oral/details, last visited Sept. 24, 2018.

duodenum.  (Id.)

Plaintiff received her insulin pump on October 29, 2013.  (Record at 846, 869.)

On November 21, 2013, Plaintiff visited Dr. Huyett presenting with hyperlipidemia.  (Id. at 869.)  On review of Plaintiff's systems, she was negative for nausea, abdominal pain, diarrhea and constipation, negative for chest pain, palpitations and leg swelling. (Id.)  On physical examination, her abdomen was soft, bowel sounds were normal and there was no abdominal tenderness.  (Id.)  Plaintiff exhibited no musculoskeletal edema.  (Id.)

On December 5, 2013, Plaintiff visited Dr. Huyett for a gynecologic PAP smear. (Record at 867-868.)  A review of Plaintiff's systems was positive for diarrhea but negative for abdominal pain. (Id. at 867.)  On physical examination, her abdomen was soft, bowel sounds were normal and there was no abdominal tenderness.  (Id. at 868.)

At Plaintiff's next office visit with Dr. Huyett on December 16, 2013, Plaintiff presented with blisters on her leg which formed after Plaintiff sat near a space heater. (Id. at 867.) Dr. Huyett noted that Plaintiff reported having no sensation on her leg and no pain. (Id.)  Dr. Huyett noted her concern about infection due to Plaintiff's diabetes and neuropathy, and prescribed Silvadene[24] cream to apply to the wound. (Id.)  On December 23, 2013, Plaintiff's burn was healing well.  (Id. at 866.) On January 16, 2014, the burn area was now an ulcer and scabs, and Dr. Huyett referred Plaintiff to the Wound Clinic for treatment.  (Id.)

On January 28, 2014, Plaintiff was seen by Dr. Huyett for earache, tinnitus, cough

---

[24]    Silvadene cream is used with other treatments to help prevent and treat wound infections in patients with serious burns. Silver sulfadiazine works by stopping the growth of bacteria that may infect an open wound. This helps to decrease the risk of the bacteria spreading to surrounding skin, or to the blood where it can cause a serious blood infection (sepsis). Silver sulfadiazine belongs to a class of drugs known as sulfa antibiotics. See https://www.webmd.com/drugs/2/drug-4910/silvadene-topical/details, last visited Sept. 24, 2018.

and sore throat which she had experienced for two days.  (Id. at 864-865.)  She reported no

abdominal pain, diarrhea, headaches, rhinorrhea or vomiting.  (Id. at 864.)  She was diagnosed

with sinusitis and bronchitis and prescribed Zithromax.  (Id. at 865.)  On March 28, 2014,

Plaintiff presented with sinusitis, cough, generalized body aches and a sore throat.  (Id. at 862-

863.)  A review of her systems was negative for nausea, vomiting, abdominal pain and diarrhea.

(Id. at 863.) She was again prescribed Zithromax, fluids, salt water gargles and nasal saline.  (Id.

at 864.)

On April 14, 2014, Plaintiff reported blurred vision at both near and far distance

during an eye exam.  (Id. at 846.)  Plaintiff reported smoking one pack of cigarettes per day for

the past year.  (Id.)  She was diagnosed with moderate non-proliferative diabetic retinopathy.  (Id.

at 848.)  Plaintiff had a previous diagnosis of mild diabetic retinopathy on February 11, 2013,

her visual acuity with spectacle correction was 20/20 and she was reportedly a non-smoker at that

time.  (Id. at 745, 849-851, 900.)

On July 10, 2014, Plaintiff visited Dr. Huyett complaining of dizziness for

approximately one month and light sensitivity.  (Id. at 860-862.)  She denied abdominal pain,

congestion, coughing, fever, headaches, nausea, sore throat or vomiting.  (Id. at 860.)   Her

abdomen was soft but tender, and Dr. Huyett ordered Lyme disease bloodwork and that Plaintiff

should push fluids and increase her salt intake.  (Id. at 862.)  The bloodwork was negative for

Lyme.  (Id. at 907-918.)

On August 12, 2014, Plaintiff was seen for moderate dysphagia by Erin Nonland,

PA-C at Digestive Disease Associates.  (Id. at 888-899.)  Plaintiff reported voice changes and

hoarse voice for approximately four months due to a feeling that food and liquids were

intermittently stuck in her throat.  (Id.) P.A. Nonland diagnosed Plaintiff with dysphagia,[25] gastroesophageal reflux disease, gastroparesis, and chronic diarrhea.  (Id.) Plaintiff denied changes in bowel pattern or abdominal pain, weight loss, anorexia, nausea, vomiting, reflux, constipation, dizziness, lightheadedness, weakness, fatigue, fever, chills, night sweats, chest pain or shortness of breath.  (Id. at 894.)  Plaintiff reported chronic diarrhea, and P.A. Nonland suspected that Plaintiff experiences diabetic enteropathy but the diarrhea "is controlled with Imodium 2 pills TID."[26] (Id. at 888.) Her evaluation has included stool studies, testing for malabsorption, c-scope and small bowel studies and all have been normal.  (Id.)  Neurologically, Plaintiff had no incontinent stool, numbness and weakness and she had no edema on bilateral palpation of her lower extremities.  (Id. at 891-892.)  Plaintiff reported that she decreased the amount of cigarettes daily to one-half pack.  (Id. at 890.)

On September 9, 2014, Plaintiff saw Dr. Huyett for soreness and a muscle knot and tenderness over her left upper scapula but no injury.  (Id. at 860.)  She wanted to discuss bone density.  (Id.)  Dr. Huyett prescribed calcium twice daily, moist heat and Plaintiff's bone density should be checked in two years.  (Id.)

On November 3, 2015, Plaintiff was seen by James P. Restrepo, M.D., of ENT Head and Neck Specialists, P.C.  (Id. at 878-880.)  Dr. Restrepo performed a flexible fiberoptic laryngoscopy and determined that dryness and GERD appear to be the source of the globus sensation Plaintiff experiences.  (Id. at 878, 880.)  He recommended that this should improve

---

[25]    Dysphagia is difficulty in swallowing.  See Dorland's Medical Dictionary for Health Consumers (2007) retrieved Sept. 24, 2018 from https://medical-dictionary.thefreedictionary.com/dysphasia

[26]    Diabetic enteropathy is a complication of diabetes mellitus marked by fecal incontinence at night. See https://psychologydictionary.org/diabetic-enteropathy/, last visited Sept. 24, 2018.   TID means three times a day. See https://www.medicinenet.com/script/main/art.asp?articlekey+6953, last visited Sept. 27, 2018.

with lozenges, humidity, or increasing fluid intake, and that Plaintiff should continue her gastrointestinal regimen and stop smoking. (Id. at 878.)

On January 21, 2015, Plaintiff was last seen by P.A. Nonland, with the same diagnoses. (Id. at 872-877.) Plaintiff reported feeling improved after making changes suggested at her last office visit at Digestive Disease Associates in August 2014 and those suggested by Dr. Restrepo. (Id. at 872.) Plaintiff's diarrhea was reported as still controlled with Imodium and the addition of a fiber supplement was discussed to help bulk stool. (Id. at 873, 876.) Plaintiff had no edema in her lower extremities bilaterally. (Id. at 876.)

On October 21, 2013, Carl Ritner, D.O., a non-examining state agency medical consultant, found Plaintiff had the severe impairments of diabetes mellitus, other disorders of the gastrointestinal system, and peripheral neuropathy. (Record at 98.) Dr. Ritner opined that Plaintiff can occasionally lift twenty pounds, frequently lift ten pounds, stand/walk for two hours in a normal workday, and sit for six hours in a normal workday. (Id. at 99.) Dr. Ritner found that Plaintiff is capable of sedentary work. (Id. at 102.)

On March 4, 2015, Physician Assistant Nonland, completed a medical source statement regarding Plaintiff's impairments. (Id. at 852-855.) She identified Plaintiff's symptoms from gastroparesis, abdominal pain, dysphagia, and diabetic enteropathy as: chronic diarrhea, abdominal pain and cramping, weight loss, nausea, fatigue and mucus in stool. (Id. at 852.) She stated that Plaintiff experiences daily epigastric abdominal pain of moderate severity as a result of her impairments. (Id.) Plaintiff suffers from fecal incontinency, and needs to move her bowels anywhere from five to twenty times daily, with accidents occurring despite medical therapy. (Id.) Physician Assistant Nonland opined that Plaintiff is limited due to fecal urgency,

needs frequent bathroom breaks, and should not do excessive physical activity. (Id. at 853.) She

opined that Plaintiff can sit for fifteen minutes at a time and stand for fifteen minutes at a time.

(Id.) In a total workday, Physician Assistant Nonland opined that Plaintiff can sit and stand/walk

less than two hours total in an eight-hour workday, needs a job that permits shifting positions at

will, and permits ready access to a restroom.  (Id. at 854.)  She opined Plaintiff can frequently lift

less than ten pounds, occasionally lift ten pounds, and never lift over 10 pounds. (Id.) She also

opined that Plaintiff will need to take unscheduled restroom breaks five to twenty times a day,

will be away from her work for fifteen minutes, and only has a few minutes advance notice of the

need to use the restroom.  (Id. at 855.) Physician Assistant Nonland opined Plaintiff would be

off-task 20% of the day and absent more than four days per month.  (Id.)

On March 4, 2015, Dr. Huyett completed a medical source statement regarding

Plaintiff's impairments.  (Id. at 856-59.) She identified Plaintiff's symptoms due to diabetes with

neuropathy, gastroparesis, and history of high blood pressure as: difficulty walking, swelling,

vascular disease/leg cramping, nausea/vomiting, extremity pain and numbness, diarrhea,

dizziness/loss of balance, hyper/hypoglycemic attacks, diabetic gut, sensitivity to light/heat/cold,

and abdominal pain. (Id. at 856.) Her clinical findings include decreased sensation in Plaintiff's

legs and feet, and ulcers on her right leg. (Id.) Dr. Huyett noted that Plaintiff has been diagnosed

with neuropathy. (Id. at 857.) Symptoms of Plaintiff's neuropathy include paresthesia, pain, loss

of sensation, postural hypotension, gross/fine motor difficulties, dysesthesias, fecal incontinence,

cramping and burning of calves and feet, and difficulty walking, running, and climbing stairs.

(Id.) Dr. Huyett noted that Plaintiff's pain/paresthesia is severe, and is worse in the lower

extremities. (Id.) She notes that Plaintiff has burned herself multiple times due to her inability to

feel heat.  (Id.) Dr. Huyett opined that Plaintiff can sit and stand/walk for fifteen minutes at a time and can sit and stand/walk less than two hours in an eight-hour workday. (Id.) Dr. Huyett also opined that Plaintiff should have her legs elevated above her heart and she would need to do this the entire workday. (Id. at 858.) She opined that Plaintiff occasionally needs a cane and needs a job that permits ready access to a restroom. (Id.)  Dr. Huyett opined that Plaintiff can frequently lift less than ten pounds, occasionally lift ten pounds, and can never lift over twenty pounds. (Id.)

Dr. Huyett opined that Plaintiff would need to take unscheduled breaks during the workday depending on her blood sugar levels and need for the bathroom, Plaintiff would be off-task more than 20% of the day and would miss more than four days of work per month.  (Id. at 859.) Lastly, Dr. Huyett opined that Plaintiff needs to avoid temperature extremes due to her sensory limitations and would need frequent bathroom breaks due to her diarrhea. (Id.)

In addition to reviewing the transcript of the administrative hearing and the administrative decision in this case, this Court has independently and thoroughly examined all of the medical records and disability reports.  We will not further burden the record with a detailed recitation of the facts.  Rather, we incorporate the relevant facts in our discussion below.

## III.    <u>LEGAL STANDARD</u>

The role of this Court on judicial review is to determine whether there is substantial evidence in the administrative record to support the Commissioner's final decision. Any findings of fact made by the Commissioner must be accepted as conclusive, provided that they are supported by substantial evidence.  42 U.S.C. § 405(g).

"Substantial evidence" is deemed to be such relevant evidence as a reasonable

mind might accept as adequate to support a decision. Richardson v. Perales, 402 U.S. 389, 407 (1971), quoting, Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). See also Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 113 S.Ct. 1294 (1993). The ALJ must consider all relevant evidence in the record and provide some indication of the evidence he rejected and why he rejected it. See Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Thus, the issue before this Court is whether the Commissioner's final decision of "not disabled" should be sustained as being supported by substantial evidence. Moreover, apart from the substantial evidence inquiry, a reviewing court must also ensure that the ALJ applied the proper legal standards in evaluating a claim of disability. Coria v. Heckler, 750 F.2d 245 (3d Cir. 1984).

To prove disability, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." 42 U.S.C. § 423(d)(1). Each case is evaluated by the Commissioner according to a five-step process:

> The sequence is essentially as follows: (1) if the claimant is currently engaged in substantial gainful employment, he will be found not disabled; (2) if the claimant does not suffer from a "severe impairment," he will be found not disabled; (3) if a severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 and has lasted or is expected to last continually for at least twelve months, then the claimant will be found disabled; (4) if the severe impairment does not meet prong (3), the Commissioner considers the claimant's residual functional capacity ("RFC")[27] to determine whether he can perform work

---

[27]    Residual functional capacity measures

> what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and

he has done in the past despite the severe impairment - if he can, he will be found
not disabled; and (5) if the claimant cannot perform his past work, the
Commissioner will consider the claimant's RFC, age, education, and past work
experience to determine whether he can perform other work which exists in the
national economy.  See id. § 404.1520(b)-(f).

Schaudeck v. Comm'r of Social Sec., 181 F.3d 429, 431-32 (3d Cir. 1999).  The claimant bears

the burden of proof at steps one through four, while the burden shifts to the Commissioner at the

fifth step to establish that the claimant is capable of performing other jobs in the local and

national economies, in light of her age, education, work experience and residual functional

capacity.  Poulos v. Comm'r of Social Sec., 474 F.3d 88, 92 (3d Cir. 2007).

## IV.  ALJ DECISION AND PLAINTIFF'S REQUEST FOR REVIEW

As noted earlier, Plaintiff is alleging disability beginning July 30, 2013, due to

brittle diabetes type 1, diabetic neuropathy, diabetic dermopathy, gastroparesis, bowel

incontinence and high cholesterol.  (Record at 215.)  The ALJ proceeded through the sequential

evaluation process and determined at step two of the sequential evaluation process that Plaintiff

was not disabled because her impairments, specifically diabetic neuropathy and bowel

incontinence, did not meet the severity threshold.

In her request for review, Plaintiff challenges the ALJ's step-two finding that her

diabetes mellitus, diabetic peripheral neuropathy, and bowel incontinence were not severe

medically determinable impairments.  (Pl. Br. at 7-11.)  Plaintiff specifically argues that: (1)

substantial evidence does not support the ALJ's finding that the record lacked evidence of

---

mental activities.

SSR 96-8p, 61 Fed. Reg. 34474.  An RFC assessment must be based on all of the evidence in the case record.  20
C.F.R. § 416.945(a); SSR 96-7p, 61 Fed. Reg. 34483; SSR 96-8p.

chronic diabetic complications or incontinence; (2) substantial evidence does not support the

ALJ's analysis of the medical source opinions; and (3) the ALJ erred by failing to address the

previous ALJ decision in which Plaintiff's diabetes and diabetic neuropathy were found to be

severe.

The issue before this Court is whether the Commissioner's final decision of "not

disabled" should be sustained as being supported by substantial evidence. Based on an

independent review of the record and for the reasons that follow, we find that the ALJ has not

provided appropriate and adequate support for his decision. Accordingly, we conclude that the

ALJ's decision is not supported by substantial evidence of record. We will, therefore, remand

this case for further review of the Step 2 severity analysis.

## V.  DISCUSSION

The ALJ held that Plaintiff "has not had any severe impairment that has met the

duration requirements of the Act since the alleged onset date." (Record at 24.) He specifically

stated the following:

> At Step 2 of the process, pursuant to 20 CFR 416.920(c), a "severe" impairment is
> one that has more than a minimal effect on the ability to engage in basic work
> activities. SSR 85-28 and SSR 96-3p. A slight abnormality that does not have
> such an effect is not a severe impairment. Bowen v. Yuckert, 482 U.S. 137,
> 149-150 (1987). Pursuant to SSR 96-3p, symptoms will not be found to affect a
> claimant's ability to do basic work activities unless objective medical evidence
> (i.e., signs and laboratory findings) establish that she has a medically-
> determinable physical or mental impairment that reasonably could be expected to
> produce the alleged symptoms. SSR 96-4p further states that "under no
> circumstances" may symptoms alone establish an impairment.
>
> Step 2, therefore, requires the ALJ to make three determinations. First, the ALJ
> must determine whether the objective evidence establishes at least one
> medically-determinable impairment. If the objective evidence does not establish a
> medically-determinable impairment, the ALJ need not consider the claimant's

allegations and reported symptoms relating to any such purported impairment. If the objective evidence establishes a medically-determinable impairment, the ALJ then must consider relevant signs and symptoms to determine whether that medically-determinable impairment has more than a minimal effect on the ability to work.

Finally, the ALJ must determine whether any such impairment is likely to cause death or last at least 12 continuous months. SSR 85-28. SSR 82-52 further explains that satisfaction of the "duration" requirement requires proof that the claimant has at least one medically-determinable impairment that will be disabling 12 months after the alleged onset date. "It is the inability to engage in [substantial gainful activity] because of the impairment that must last the required 12-month period." SSR 82-52. This standard, known as the "duration" requirement, "does not become an issue unless at some time an impairment is severe and prevents [substantial gainful activity]." POMS DI 25505.010.

At the hearing, the claimant testified that she feels constant pain in her legs and numbness in her feet and suffers from daily bowel incontinence. As a result, she said, she can lift only one gallon (approximately eight pounds), can sit, stand and walk only 15 minutes each at a time, uses a cane, frequently elevates her legs and, in her opinion, could not work full-time. Even so, she also stated that she feels little pain after taking medication, maintains grooming and hygiene, performs most routine household chores, goes shopping and drives. The claimant previously has made similar statements (Exhibit 2E).

Concerning the claimant's alleged pain in her legs and numbness in her feet, she has diabetes mellitus with diabetic peripheral neuropathy, which resulted in an acute episode involving ketoacidosis, renal failure and loss of sensation in July, 2013. The record since then, however, includes no such episodes, no complaints of numbness or pain relating to diabetes and no abnormal neurological findings on examination. Similarly, diagnostic testing in December, 2012, revealed occlusive disease of the feet but the record since then does not include any indication of resulting pain or possible work-related limitations (Exhibits 1F-9F). In the absence of any such evidence since the alleged onset date, the claimant has failed to meet her burden of establishing more than minimal work-related limitations.

Concerning the claimant's alleged daily bowel incontinence, the record since the alleged onset date does not include such complaints, any relevant diagnostic test results or any relevant abnormal examination findings. The claimant therefore has failed to meet her burden of establishing any relevant medically-determinable impairment.

The record also does not indicate any other possible severe impairment since the

alleged onset date.

I therefore resolve this case at Step 2 of the evaluation.

Findings of fact made by state agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of a claimant's impairments represent expert opinion evidence of non-examining sources. Although a consultant's findings do not bind me, I must consider and give them whatever weight they deserve.

The state agency found in October, 2013, that the claimant's medical condition limited her to light work with environmental restrictions (Exhibit 3A). The state agency's reviewer, however, could not know that the record from that point on would not include any evidence that might support the claimant's allegations. I therefore do not rely on this assessment.

20 CFR 416.927 and SSR 96-9p stipulate that a medical opinion on the nature and severity of a claimant's impairment deserves controlling weight if (1) the source is a "treating source"; (2) the opinion is well-supported by medically acceptable clinical, laboratory or diagnostic techniques; and (3) the opinion is not inconsistent with other substantial evidence in the case record. If such an opinion is not well-supported or is contradicted by other medical evidence, however, an administrative law judge need not defer to the opinion of a treating physician. See Plumer v. Apfel, 186 F.3rd 422, 429 (3rd Cir. 1999); Jones v. Sullivan, 954 F.2d 125, 129 (3rd Cir. 1991).

Here, a physician's assistant recently offered an opinion that the claimant could not work eight hours per day, would need excessive breaks, likely would miss more than four days of work per month and has still other limitations (Exhibit 7F). Although this assistant appears to qualify as a treating source, I find this opinion unconvincing in light of the evidence previously set forth at length from various sources. First, the assistant relied heavily on the claimant's supposed chronic abdominal pain, nausea and dysphagia, which the claimant herself did not mention in her hearing testimony, and on bowel incontinence, of which no evidence exists in the record. Treatment notes since the alleged onset date, moreover, generally reflect only the claimant's complaints with no examination results indicating a disabling medical condition. The record also does not indicate that the assistant has any special training or expertise in assessing ability to work or that he knows and understands the Agency's definition of disability. I therefore do not rely on this unsupported opinion.

At the same time, Dr. Rebecca Huyett offered her opinion that the claimant has the limits proposed by the physician's assistant (Exhibit 8F). Although Dr. Huyett

qualifies as a treating source, this opinion suffers from the deficiencies that undermine the assistant's opinion. In addition, Dr. Huyett offered almost no statement of reasons in support of this opinion other than to check boxes on a form and cite the claimant's diagnoses.[fn1]  Accordingly, I do not rely on this unsupported opinion, either.

> [fn1]Local federal district and circuit court opinions take a dim view of the evidentiary value of such check-off forms:
>
> It is well established that an ALJ may reject conclusions of a treating physician's opinion which is brief and conclusory in form with little in the way of clinical findings to support its conclusion. *Good v. Weinberger*, 398 F. Supp. 350, 355 (W.D. Pa. 1976)(quoting *Bledsoe v. Richardson*, 469 F.2d 1288 (7th Cir. 1972).  In addition, the Third Circuit has stated that a form report in which a physician only must check a box or fill in blanks is "weak evidence at best."  *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1992); *accord Parks v. Chater*, 1995 WL 505956 (E.D. Pa. 1995); *Brewster v. Heckler*, 786 F.2d 581, 585 (3d Cr. [sic] 1986).
>
> *Colavita v. Apfel*, 75 F. Supp.2d 385 (E.D. Pa. 1999).

Because the claimant has not had a severe, medically-determinable impairment that has met the duration requirements of the Act since the alleged onset date, she is not disabled within the meaning of the Social Security Act.

(Record at 22-24.)  "The step-two inquiry is a de minimis screening device to dispose of groundless claims." Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003) (citing Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); McDonald v. Sec'y of HHS, 795 F.2d 1118, 1124 (1st Cir. 1986)).

> The burden placed on an applicant at step two is not an exacting one. Although the regulatory language speaks in terms of "severity," the Commissioner has clarified that an applicant need only demonstrate something beyond a "slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work."

McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004) (citing SSR 85-28; Newell, 347 F.3d at 546)(holding if claimant adduces evidence showing more than a "slight

abnormality," the "step-two requirement of 'severe' is met, and the sequential evaluation should continue."). "'[S]tep two is to be rarely utilized as basis for the denial of benefits,' and therefore 'its invocation is certain to raise a judicial eyebrow.'" Byrd v. Berryhill, Civ.A. No. 17-2993, 2018 WL 2009535, *2 (E.D. Pa. Apr. 27, 2018)(quoting McCrea, 370 F.3d at 361).

An impairment is considered severe at step two if it results in significant (or more than minimal) limitations for a continuous period of at least twelve months. 20 C.F.R. §§ 416.909, 416.920(a)(4)(ii), (c); Social Security Ruling (SSR) 96-3p, 1996 WL 374181, at *1. The severe impairment must meet the durational requirement, meaning that it must be severe for a continuous period of at least twelve months. 20 C.F.R. §§ 416.909, 416.920(a)(4)(ii); see Barnhill v. Astrue, 794 F. Supp.2d 503, 514 n.7 (D.Del. May 12, 2011) (noting that at step two, "claimant's impairments must meet the duration requirement of twelve months"); see also 20 C.F.R. § 416.920(c) ("[I]t is possible for you to have a period of disability for a time in the past even though you do not now have a severe impairment.").

Plaintiff contends that she meets the Step 2 de minimis standard and the ALJ should have continued the sequential evaluation. Regarding her diabetes mellitus and diabetic peripheral neuropathy, Plaintiff notes that the ALJ found, "[t]he record…includes no such episodes [of diabetic ketoacidosis, renal failure and loss of sensation], no complaints of numbness or pain relating to diabetes and no abnormal neurological findings on examination…in the absence of any such evidence since the alleged onset date, the [Plaintiff] has failed to meet her burden[.]" (Record at 23.) Regarding Plaintiff's claimed daily bowel incontinence, the ALJ found, "the record since the alleged onset date does not include such complaints, any relevant diagnostic test results or any relevant abnormal examination findings. The [Plaintiff] therefore

has failed to meet her burden[.]" (Id.)

Plaintiff contends that the ALJ's statements that the record contains no episodes of ketoacidosis, loss of sensation, no complaints of numbness or pain relating to diabetes and no complaints, relevant diagnostic test results or any relevant abnormal examination findings of daily bowel incontinence after her July 28, 2013 to August 2, 2013 hospital stay are erroneous. Plaintiff notes that she went to the hospital on August 7, 2013 for a gastrointestinal bleed and diabetic ketoacidosis. (Record at 421.) Plaintiff also notes that support for her complaints of neuropathy can be seen on December 16, 2013, when she developed blisters on her leg from a space heater because she could not feel the heat from it and was referred to Wound Care by Dr. Huyett because the burn formed an ulcer and was not healing correctly. (Id. at 866-867.) Regarding Plaintiff's fecal incontinence, she notes that she treated at Digestive Disease Associates with P.A. Nonland, who noted that Plaintiff's diarrhea issues were likely due to diabetic enteropathy. (Id. at 889.) Thus, Plaintiff argues that it is unclear how the ALJ found that the record included no acute episodes, complaints, or abnormal examination findings related to Plaintiff's impairments after her alleged onset date. The Defendant does not address Plaintiff's argument that it is unclear whether the ALJ considered the cited record evidence supporting her claims. We note, however, that the ALJ, in rejecting the opinion of P.A. Nonland, stated the following:

> the assistant relied heavily on the claimant's supposed chronic abdominal pain, nausea and dysphagia, which the claimant herself did not mention in her hearing testimony, and on bowel incontinence, of which no evidence exists in the record. **Treatment notes since the alleged onset date, moreover, generally reflect only the claimant's complaints with no examination results indicating a disabling medical condition.**

(Record at 24)(emphasis added).   The Defendant argues only that Plaintiff's objective signs of

her impairments were minimal, at best, and did not support her claim of significant on-going

limitations and that Plaintiff does not met the twelve month durational requirement.

In support of this argument that Plaintiff does not meet the twelve month severity

durational requirement, Defendant notes the following:

Starting on July 28, 2013, Plaintiff was admitted to the hospital three times in eight days with complaints of abdominal pain, nausea, vomiting, and diarrhea (Tr. 343-44, 350-51, 428). She was diagnosed with acute diabetic acidosis and an upper gastrointestinal bleed (Tr. 343-44, 350-51, 422). When she returned to the hospital on August 7, 2013, she had been discharged only the day before (Tr. 429). Furthermore, when she returned, she stated that her pain and vomiting had subsided for only four hours (Tr. 435). In a follow up visit the next month, her doctor characterized this as a single acute episode lasting from July through August 2013 (Tr. 774). Therefore, the ALJ properly considered this to be a single acute episode, with no recurrence thereafter (Tr. 23).

Indeed, in subsequent doctor visits, Plaintiff did not have similar symptoms. By the time of her discharge from the hospital on August 13, 2013, Plaintiff displayed a normal range of motion with no weakness, edema, tenderness, or nerve deficits (Tr. 432-33). In a follow-up examination on August 21, 2013, her systems were normal, and there were no findings of abdominal pain or ketoacidosis (Tr. 727). On September 4, 2013, Plaintiff reported that with medication she felt "great," she was eating without vomiting or abdominal pain, and her condition was "better controlled." (Tr. 774). On November 21, 2013, January 28, 2014, March 28, 2014, and July 10, 2014, she was negative for nausea, abdominal pain, and diarrhea (Tr. 860, 863-64, 869). In October 2014, she had no incontinence, weakness, or numbness (Tr. 884). On January 21, 2015, Erin Nonland, PA-C, a treating Physician's Assistant, noted that Plaintiff's diarrhea was controlled with Imodium, all stool samples were normal, Plaintiff had a normal colonoscopy, and she had improved with treatment (Tr. 872-73). Therefore, the ALJ correctly found that Plaintiff's ketoacidosis and related gastrointestinal distress did not recur.

Although Plaintiff argues that PA Nonland provided objective evidence of diarrhea (Pl. Br. at 9 (citing Tr. 889)), the treatment record to which Plaintiff cites, from August 12, 2014, states that all testing had been normal, and PA Nonland suspected that Plaintiff had diabetic enteropathy (Tr. 888). Moreover, PA Nonland noted that [] Plaintiff's diarrhea was controlled with Imodium (Tr. 888), and in repeated treatment visits during the relevant period, Plaintiff was negative for diarrhea (Tr. 860, 863-64, 869). Thus, as the ALJ found, the record lacks evidence

of repeated acute episodes of diabetic ketoacidosis, or any objective evidence related to on-going functional limitations associated with ketoacidosis or diarrhea (Tr. 22-23). See Bryan v. Barnhart, No. 04-191, 2005 WL 273240, at *2 (E.D. Pa. Feb. 2, 2005) (finding the Commissioner is "entitled to rely not only on what the record says, but also on what it does not say" (quoting Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983)).

   Plaintiff further argues that her treatment for blisters in December 2013, after she burned her legs on a space heater, shows on-going problems from diabetes (Pl. Br. at 9 (citing Tr. 867)). However, a week after her injury, she was doing better, her burns were healing well, and there were no signs of infection (Tr. 866). Thereafter, she continued to seek treatment from the same provider, but never again sought treatment for burns or diabetic ulcers as an on-going problem (Tr. 860-64). Her musculoskeletal examinations also do not show on-going limitations due to ulcers, numbness or pain in her legs (Tr. 727-35, 774, 860-69, 872-88). Thus, this was an isolated traumatic injury, not evidence of on-going limitations. See, e.g., Oshetsky v. Colvin, No. CIV.A. 12-751, 2013 WL 4810196, at *3 (W.D. Pa. Sept. 9, 2013) (finding that the plaintiff failed to prove that a torn knee ligaments was severe at step two because there was no evidence that the injury was so severe it could not be repaired). Moreover, even if this traumatic event could be linked to her prior gastrointestinal episode in July of 2013, only five months elapsed between the two incidents (Tr. 343-44, 350-51, 866). This is insufficient to meet the 12-month durational requirement. Id. (citing 42 U.S.C. 423(d)(1)(A), 1382c(a)(3)(A)); see also 20 C.F.R. §§ 416.909, 416.920(a)(4)(ii).

Def.'s Br., pp. 6-8.

   Plaintiff responds that this is impermissible post hoc rationalization, which this Court should reject.  Plaintiff notes that the ALJ says that there were no episodes of diabetic ketoacidosis since July 2013, which is not the case.  Defendant argues that "the ALJ properly considered [Plaintiff's diabetic ketoacidosis episodes] to be a single acute episode, with no recurrence thereafter." Dkt. No. 12 at p. 6. The problem with this argument, however, is that it is unclear whether the ALJ considered these close hospitalizations to be a single acute episode, and did not consider the later records of Plaintiff's hospitalizations for diabetic ketoacidosis, which went into August 2013.  Next, regarding Plaintiff's fecal incontinence, Defendant argues that the ALJ properly found that the record lacks evidence regarding functional limitations due to

diarrhea. Dkt. No. 12 at p. 7. Plaintiff notes that the problem with Defendant's argument is that the ALJ does not make any citation to the record to support this finding, and Defendant again is supplying post hoc rationalization to a finding by the ALJ. Regarding Plaintiff's diabetic neuropathy, Defendant crafts the response to make it seem as if the blisters and diabetic ulcers Plaintiff has gotten as a result of her neuropathy are acute episodes, "not evidence of on-going limitations." Dkt. No. 12 at p. 7. Plaintiff contends that this argument is problematic, because Defendant seemingly argues that the blisters and ulcers are the impairment, not that the cause of these wounds is Plaintiff's diabetic neuropathy and her resulting lack of feeling in her feet and legs due to this condition. Plaintiff argues that neuropathy is not a condition that can improve.

The ALJ completely failed to mention the records cited by Plaintiff, therefore it is unclear if these records were even considered by the ALJ in his step 2 decision. Compounding this lack of clarity is the ALJ's statement that "[t]reatment notes since the alleged onset date, moreover, generally reflect only the claimant's complaints." Record at 24. "A district court cannot conduct a de novo review of the Commissioner's decision, or reweigh the evidence of record; the court can only judge the propriety of the decision with reference to the grounds invoked by the Commissioner when the decision was rendered." Johnson v. Colvin, No. 14-828, 2014 WL 6090421, at *1 (W.D. Pa. Nov. 13, 2014); Schwartz v. Halter, 134 F. Supp.2d 640, 647 (E.D. Pa. 2001). Thus, where the ALJ has failed to adequately explain in the record his reasons for rejecting or discrediting competent evidence, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." Schwartz, 134 F.Supp. at 648 (citing Cotter, 642 F.Supp. at 705). The ALJ must provide sufficient discussion to allow the court to determine whether any rejection of potentially pertinent, relevant evidence was proper. Johnson

v. Comm'r of Soc. Sec., 529 F.3d 198, 203-04 (3d Cir. 2008). The cited records by Plaintiff are relevant to the severity analysis and the ALJ's statement that there was no evidence of episodes of ketoacidosis, loss of sensation, no complaints of numbness or pain relating to diabetes and no complaints, relevant diagnostic test results or any relevant abnormal examination findings of daily bowel incontinence after her July 28, 2013 to August 2, 2013 hospital stay. Thus, according to Plaintiff, the ALJ's decision is unsupported by substantial evidence.

Without any discussion of the records noted by Plaintiff, the ALJ's determination cannot be said to be supported by the "evidence of record" because it is unclear that the ALJ even considered those records in his Step 2 denial of Plaintiff's application for benefits. Accordingly, this case will be remanded for further review of the record and explanation by the ALJ of the decision at step 2 of the sequential evaluation.

This decision does not address Plaintiff's two other contentions, that the ALJ's analysis of the medical source opinions is not supported by substantial evidence, and the ALJ was required to address the prior ALJ decision because reconsideration of the above issues may impact the ALJ's decision in that regard.

An appropriate Order follows.